7/24/26

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| SHAWN OSBORNE et al., | B342516 |
| Plaintiff and Appellants, | (Los Angeles County Super. Ct. No. 24STCP02640) |
| v. | |
| DEAN C. LOGAN, as Los Angeles County Registrar-Recorder/County Clerk, | |
| Defendant and Respondent, | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT et al. | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis A. Kin, Judge.  Reversed.

Law Offices of Jason A. Bezis and Jason A. Bezis for Plaintiffs and Appellants.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Deputy County Counsel, for Defendant and Respondent.

Strumwasser & Woocher, Beverly Grossman Palmer, Dale K. Larson, Salvador E. Perez; Devora Navera Reed and Mark Miller for Real Parties in Interest and Respondents.

———————————

## INTRODUCTION

Shawn Osborne and Lawrence Sand (the challengers) are registered voters in the Los Angeles Unified School District. In 2024 the District sought to issue $9 billion in bonds, which required voter approval because the bonds would be repaid by an ad valorem tax on the district's property owners. Before the election the challengers filed a petition for writ of mandate in the trial court, seeking an order requiring various changes to the language of the measure the District—through the Los Angeles County Registrar-Recorder/County Clerk—planned to place on the ballot. The trial court denied the petition, the election proceeded as scheduled with the ballot question as proposed, and the District's voters approved the bond measure.

The challengers, who concede their appeal is "technically moot," do not seek to overturn the results of the election. They ask us to decide whether, consistent with Elections Code section 13119, subdivision (b),[1] the proponents of a bond measure

_____

[1] Undesignated statutory references are to the Elections Code.

2

can represent the taxes property owners will pay in one unit of measurement on the ballot and a different unit of measurement in the voter information materials the Legislature requires for bond measures.

We conclude that, though the appeal is moot, we should exercise our discretion to decide the issue under an exception to the mootness doctrine that often applies in election cases: appeals presenting issues of general public interest that are likely to recur. We also conclude the District should have expressed the rate of the tax on the ballot as section 9401, subdivision (c), requires ballot information materials to state it: in terms of the tax rate per $100,000, not (as the District stated it) per $100, of assessed valuation. Therefore, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The School Board Adopts Bond Measure US and Asks the Registrar To Include the Measure on the November 2024 Ballot*

On August 7, 2024 the District's governing board held a special meeting. The sole item on the agenda was whether to submit for voter approval a measure authorizing the District to issue $9 billion in bonds. The Board "encourage[d] public comment" on the agenda item, but it is not clear from the record how much time the public had to prepare comments. The record reveals only that the agenda "was posted at least 24 hours before the meeting."

The resolution, which the Board unanimously approved, proposed submitting the following "statement of the bond measure" to voters: "'Local Public Schools Safety and Upgrades

3

Measure: To update school facilities for 21st century learning and career/college preparedness; improve school facilities for safety, earthquakes and disability access; upgrade plumbing, electrical, HVAC; replace leaky roofs; provide learning technology; and create green outdoor classrooms/schoolyards; shall Los Angeles Unified School District's measure be adopted authorizing $9,000,000,000 in bonds at legal rates, levying approximately 2.5¢ per $100 of assessed valuation (generating $456,123,000 annually) until approximately 2059, with audits/citizens' oversight?'" (Italics omitted.)

This statement, which was the main content of the "ballot label" (what voters see printed on the ballot), was a condensed combination of what the Elections Code defines as the "ballot title and summary." (See § 303 [defining ballot label for purposes of a statewide measure as "a condensed version of the ballot title and summary" followed by a list of supporters and opponents]; § 303.5 [defining "ballot title and summary"]; § 9051, subds. (b)(1) & (c)(1) [requiring a "condensed ballot title and summary" for statewide initiative measures and defining the "ballot label" as "the condensed ballot title and summary" followed by a list of supporters and opponents]; § 10403, subd. (a)(2) [statutes governing the wording of statewide measures apply when districts consolidate measures with statewide elections]; § 13103, subd. (c) [ballot must contain the "titles and summaries of measures submitted to vote of the voters"].) The Registrar eventually designated the measure as Measure US.

The Board's resolution acknowledged there was a statewide general election on November 5, 2024 and asked the Registrar to submit Measure US to voters on that election day. (See Ed. Code, § 5342 [authorizing consolidation of school district elections with

4

other elections occurring on the same date].)  The resolution directed the Registrar to use the Board's statement of the bond measure (meaning the condensed ballot title and summary) on the ballot.

The Board's resolution also adopted a tax rate statement, which section 9401, subdivision (a), states must be "mailed to the voters with the sample ballot for the bond election."  The Board's tax rate statement for Measure US described the "best estimate of the average annual tax rate" as "$25.04 per $100,000 (2.504 cents per $100)," the "best estimate of the highest annual tax rate" as "$45.01 per $100,000 (4.501 cents per $100)," and the "best estimate of the total debt service" as "$15,964,303,000."

The Elections Code requires any district, city, or other political subdivision proposing to include a measure on the ballot in a statewide election to file its resolution with the relevant elections official at least 88 days prior to the date of the election. (§ 10403.)  The Board's resolution directed the District superintendent to submit the resolution to the Registrar "as soon as practicable, and in any event no later than August 9, 2024." August 9, 2024 was exactly 88 days before the November 5, 2024 general election.  The District's superintendent submitted the Board's resolution and Measure US to the Registrar on August 8, 2024.

The Los Angeles County Counsel sent its impartial analysis of Measure US, as required by section 9500, subdivision (b), to the Registrar on August 16, 2024.  The impartial analysis stated that the "best estimate of the average tax rate" was "$25.04 per $100,000 of assessed valuation" and that the "best estimate of the highest tax rate" was "$45.01 per $100,000 of assessed valuation."  Unlike the District's tax rate statement, the County

5

Counsel's impartial analysis did not state any tax rate in terms of the cost per $100 in assessed property value.

B.     *The Challengers File a Petition for Writ of Mandate*

On August 19, 2024 the challengers filed a petition for writ of mandate challenging the language of the measure.  The challengers sought an order compelling the Registrar or the District to make four amendments to the proposed ballot label: (1) state the tax rate as "$25.04 per $100,000," rather than "2.5¢ per $100"; (2) add language describing the funds raised as "taxes"; (3) add the language "retire existing debt" to the partial list of bond goals; and (4) revise the language of the ballot label so that it began with "Shall the Measure" and ended with "Be Adopted."

The challengers sought to expedite the briefing schedule given the upcoming election.  The Registrar agreed that a shortened schedule was necessary and that, considering when the Registrar would have to print election materials before the November 5, 2024 election, August 29, 2024 was the "[l]ast date to make changes, additions, or deletions to any measure text." The court set a hearing on the petition for August 29, 2024, over the challengers' objection the hearing date would "leave no time whatsoever for appellate review."

C.     *The Trial Court Denies the Challengers' Petition, and the Voters Approve the Bond Measure*

The trial court denied the petition, declining to order the Registrar or the District to make any changes to the language of the ballot statement.  The court ruled section 9401, subdivision (c), which states "'tax rate' means tax rate per one

hundred thousand dollars ($100,000) of assessed valuation on all property to be taxed," applied only to the voter information guide and the tax rate statement mailed to voters, not to the ballot. The trial court stated that, in the alternative, it "would find under the circumstances that the ballot question here substantially complies with the requirements" of section 9401, subdivision (c), because, the court explained, "the tax rate *is* also expressed as a ratio with a denominator of $100,000 in the accompanying voter information guide."  The court rejected the challengers' other requested amendments, ruling that the grammatical structure of the question complied or substantially complied with the Elections Code and that the other language the challengers complained about was not false, misleading, or prejudicial.

The trial court denied the petition on August 29, 2024 in a hearing that ended at 3:58 p.m.  The Registrar had previously advised the court that the Registrar needed direction from the court by 5:00 p.m., August 29, 2024 "to avoid any interference with the printing and distribution of the ballots and the conduct of the November 5, 2024" election.  The challengers did not file a petition for writ of mandate with, or a request for an immediate stay from, this court.  (See Cal. Rules of Court, rule 8.486.)

The trial court entered judgment on September 20, 2024. The November 5, 2024 election occurred, and the voters approved Measure US with 68.02 percent of the votes cast.  (Los Angeles County Registrar-Recorder/County Clerk, "November 5, 2024 General Election Results," Los Angeles Unified School District General Election – Measure US, available at <https://results.lavote.gov/text-results/4324> [as of July 24,

7

2026], archived at <https://perma.cc N2JR-QPHE>.)[2]  The challengers timely appealed from the judgment.

**DISCUSSION**

A.   *We Exercise Our Discretion To Consider a Portion of the Challengers' Moot Appeal*

Courts generally do not render opinions in cases where subsequent events make it impossible to grant effective relief. (*In re D.P.* (2023) 14 Cal.5th 266, 276; *San Diego Public Library Foundation v. Fuentes* (2025) 111 Cal.App.5th 711, 722; *Kunde v. Seiler* (2011) 197 Cal.App.4th 518, 527.)  The challengers sought changes to the ballot label for the November 5, 2024 election— relief that can no longer be granted because the election occurred almost two years ago.  (See *Vargas v. Balz* (2014) 223 Cal.App.4th 1544, 1550 ["Strictly speaking, there is no actual controversy in this case because the election has been held and the results have been certified."].)  All parties agree this appeal is moot.

An exception to the mootness doctrine, however, may apply when "the issues presented 'are of general public interest and

---

[2]   The Registrar and District cite this result in their briefs. We take judicial notice of the election results pursuant to Evidence Code sections 452, subdivision (h), and 459.  (See *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 171, fn. 3 [taking judicial notice of election results]; *Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417, 1424, fn. 2 [same].)  We advised the parties of our intent to take judicial notice of the election results and afforded them an opportunity to respond.  (See Evid. Code, §§ 452, 455, subd. (a), 459, subd. (c).)

likely to recur'" but "evasive of timely appellate review." (*Kunde v. Seiler, supra*, 197 Cal.App.4th at pp. 527, 528; see *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933; *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 172; *San Diego Public Library Foundation v. Fuentes, supra*, 111 Cal.App.5th at pp. 722-723.) "This exception is often applied in election cases." (*Kunde*, at p. 527.) We exercise our discretion to apply that exception to the tax rate issue.

An initiative authorizing a school district to issue bonds "is unquestionably a matter of public interest for voters impacted by district special taxes" (*Loeber v. Lakeside Joint School Dist.* (2024) 103 Cal.App.5th 552, 574) that often evades review. (See *California Cannabis Coalition v. City of Upland, supra*, 3 Cal.5th at p. 933 [whether the voters must vote on an initiative, which had the effect of imposing a tax, in a general or special election "presents important questions of continuing public interest that may evade review"]; *San Diego Public Library Foundation v. Fuentes, supra*, 111 Cal.App.5th at p. 724 [petition to confirm that the proponents of an initiative had sufficient signatures presented "an issue of public interest on matters requiring uniform application of the law throughout the state" and was "an issue that is likely to recur but by its nature will evade review"]; *Kunde v. Seiler, supra*, 197 Cal.App.4th at pp. 527-528 [whether a sample ballot could include "electioneering materials is a matter of general public interest that is likely to recur in subsequent elections"].) And, as reflected in recent legislative activity, whether the ballot label should express the taxation rate per $100 or $100,000 of assessed valuation is of particular public interest. For example, the Legislature amended section 9401, subdivision (c), to update the tax rate denominator from $100 in

9

assessed valuation to $100,000 in assessed valuation, effective January 1, 2024. (See Stats. 2023, ch. 720; Sen. Bill No. 798 (2023-2024 Reg. Sess.), § 1.)[3] The Legislature subsequently enacted statutes that would allow proponents of bond measures to refer voters to the information materials rather than printing the tax rate on the ballot label, but the Governor (twice) vetoed the bills because of concerns that removing the information from the ballot label would "reduce transparency for local tax and bond measures." (Governor's veto message to Assem. on Assem. Bill No. 699 (Oct. 1, 2025) Recess J. No. 25 (2025-2026 Reg. Sess.) p. 3552; Governor's veto message to Sen. on Sen. Bill No. 268 (Oct. 13, 2019) Recess J. (2019-2020 Reg. Sess.) p. 2998; see also Assem. Bill No. 699 (2025-2026 Reg. Sess.); Sen. Bill No. 268 (2019-2020 Reg. Sess.).)

Not only is the tax rate issue likely to recur in subsequent elections, it has already recurred. In the June 2026 statewide primary election, there were seven bond measures presented to voters in various districts in Los Angeles County; five of them stated the tax rate per $100,000 in assessed property value, and two of them stated the tax rate per $100 in value. (Los Angeles County Registrar-Recorder/County Clerk, *Measures Appearing on the Ballot, Statewide Direct Primary Election* (June 2, 2026), available at <https://content.lavote.gov/docs/rrcc/documents/measures-appearing-on-the-ballot-4-9-26-(002).pdf> [as of July 24, 2026],

---

[3] You may ask, does it really make a difference? Well, which feels more onerous: $25.04 per $100,000 in assessed property value or 2.5 cents per $100 in assessed value? $25 won't buy a tank of gas; a few pennies is nothing.

archived at <https://perma.cc/CQ6U-AZWD>[4]; see *Edelstein v. City and County of San Francisco, supra,* 29 Cal.4th at p. 172 [case was not moot where the issue was "of broad public interest and . . . likely to recur, if not in San Francisco elections, then in elections in other charter cities"]; *San Diego Public Library Foundation v. Fuentes, supra,* 111 Cal.App.5th at p. 724 [case was not moot where "the matter is likely to recur, as appellants may submit a new petition in the future"].)

Thus, how ballots express tax rates is a contemporary issue of statewide importance that is likely to recur yet often evades review. Therefore, we exercise our discretion to decide the tax rate issue in this moot appeal.[5]

B. *Standard of Review*

The parties agree the tax rate issue is a question of statutory interpretation we review de novo. (*People v. Morris* (2026) 19 Cal.5th 671, 682; *Kunde v. Seiler, supra,* 197 Cal.App.4th at p. 529.) "'Our fundamental task in

---

[4]    We take judicial notice of the official government document listing the measures that appeared on the June 2026 ballot. (Evid. Code, §§ 452, subds. (d), (h), 455, subd. (a), 459, subd. (c); see *Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 22, fn. 10 [a ballot pamphlet was "not included in the record on appeal, but, as an official government document [was] a proper subject of judicial notice"].) We deny as unnecessary the challengers' motion for judicial notice of a fact sheet about the District's 2020 bond measure; the record already establishes the District sought and received voter approval to issue $7 billion in bonds in November 2008 and in November 2020.

[5]    We do not exercise our discretion to decide the challengers' other arguments.

interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose.'" (*Prang v. Los Angeles County Assessment Appeals Bd.* (2024) 15 Cal.5th 1152, 1170.) "'"""We begin by examining the statute's words, giving them a plain and commonsense meaning."'""" (*Morris*, at p. 682.) "'"We must harmonize "the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole."'"" (*Ibid.*) "'"If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy."'"" (*Ibid.*)

  C. *The Ballot for Bond Measures Should State the Rate*
    *of the Tax the Same Way the Tax Rate Statement Does*

  Section 13119, subdivision (b), states:  "If the proposed measure imposes a tax or raises the rate of a tax, the ballot shall include in the statement of the measure to be voted on the amount of money to be raised annually and the rate and duration of the tax to be levied."  The parties dispute how section 13119, subdivision (b), requires the ballot to state "the rate . . . of the tax to be levied."  The challengers argue the "rate of the tax" on the ballot for bond measures under section 13119, subdivision (b), should be the same "tax rate" disclosed to voters under section 9401, subdivision (c), which governs the tax rate statement in the information materials mailed to voters.  Thus, the challengers argue, both the ballot label and the tax rate statement for Measure US should have expressed the tax rate

12

per $100,000 in assessed property value.  The District and Registrar agree that section 13119, subdivision (b), required the ballot label to include a tax rate, but they contend that the ballot does not have to define the rate consistent with section 9401, subdivision (b) (meaning the ballot, unlike the tax rate statement, does not have to use the per-$100,000 formula).  They maintain that the ballot only has to state the tax rate accurately and that the description of the tax rate on the ballot for Measure US, "approximately 2.5¢ per $100 of assessed valuation," was accurate.

Section 13119, subdivision (b), requires the ballot to include "the rate . . . of the tax" to be imposed.  Section 13119 does not define the term "rate" or state how the ballot should express the rate of the tax.  Because the language of the statute does not define the term as applied to bond measures, "we consider the language of the entire scheme and related statutes, harmonizing the terms when possible.  If any ambiguity remains, we may examine the legislative history and the stated purpose of the scheme to guide our interpretation." (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 632-633; see *Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1288 [where a statute does not define a term, courts view the "operative statutory language . . . in the context of the entire statutory scheme"]; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 ["words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible"].)

13

Though section 13119, subdivision (b), does not define "the rate of the tax" for bond measures, another statute in the Elections Code, section 9401, defines a bond measure's "tax rate." Section 9401, subdivision (a), states that a tax rate statement "shall be mailed to the voters with the sample ballot for the bond election" and that the statement must include the best estimate "from official sources" of "the average annual tax rate" and a statement of the "final fiscal year in which the tax is anticipated to be collected"; the best estimate of "the highest tax rate that would be required to be levied to fund that bond issue"; an estimate, based on assessed valuations or "a projection based on experience within the same jurisdiction," of what year the highest rate will apply; and the best estimate of the "total debt service" required to repay the debt if all bonds are issued and sold. Section 9401, subdivision (c), defines "tax rate" for purposes of the bond measure rate disclosures as "tax rate per one hundred thousand dollars ($100,000) of assessed valuation on all property to be taxed."

Though the term "tax rate" in section 9401, subdivision (c), and the term "the rate of the tax" in section 13119, subdivision (b), are not identical, they're very close (pretty much just the same words in a slightly different sentence structure), and the contexts in which they appear are related (both govern a bond measure). The best way to harmonize these two provisions is to interpret them similarly. (See *Ruelas v. County of Alameda* (2024) 15 Cal.5th 968, 974 [statutes that "deal '"with the same subject matter'" . . . 'should be accorded the same interpretation' in both instances"]; *Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 175 ["'Identical language appearing in separate provisions dealing with the same subject

14

matter should be accorded the same interpretation.'"]; *Gund v. County of Trinity* (2020) 10 Cal.5th 503, 518 ["'When a phrase appears in two statutes dealing with the same subject matter, we usually interpret the phrase to have the same meaning across the provisions.'"].)

Interpreting "tax rate" in section 9401, subdivision (c), to mean the same as "rate of the tax" in section 13119, subdivision (b), is also consistent with the Legislature's purpose in enacting section 9401.  (See *Sunflower Alliance v. Department of Conservation* (June 25, 2026, S287414) ___ Cal.5th ___, ___ [2026 WL 1830258, p. 7] ["Our core task is '"to adopt the construction that best gives effect to the Legislature's intended purpose."'"]; *Iloff v. LaPaille* (2025) 18 Cal.5th 551, 560 ["'When interpreting any statute, our goal is to determine the Legislature's intent and give effect to the statute's purpose.'"].)  The Legislature's stated purpose regarding the bond-specific tax rate disclosure requirements was to "present[ ] to voters the most accurate available information for their use in effecting comparisons and exercising judgment in casting their ballots." (§ 9404.)  "Effecting comparisons" would be difficult if the tax rate denominators in the ballot label and the information guides were not the same.  Creating such voter confusion would be the opposite of what the Legislature intended and hoped to accomplish.  (See *Lopez v. Ledesma* (2022) 12 Cal.5th 848, 858-859 ["our task is to construe the statutory language in a manner that 'comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences'"]; *Steuer v. Franchise Tax Bd.* (2020) 51 Cal.App.5th 417, 430 [courts should choose an

15

interpretation of a statute that "effectuates the purpose of the statute and avoids results that are contrary to legislative intent"]; *Cilibrasi v. Reiter* (1951) 103 Cal.App.2d 397, 400 ["[w]hen a statute is susceptible of two constructions, it is the duty of a court to give it such interpretation as will avoid confusion and absurdity"].)

The purpose of section 13119, subdivision (b), as stated by its author, was also to "help voters be better informed." (Assem. Com. on Elections & Redistricting, analysis of Assem. Bill No. 809 (2015-2016 Reg. Sess.) Apr. 15, 2015, p. 1; see Assem. Com. on Appropriations, analysis of Assem. Bill No. 809 (2015-2016 Reg. Sess.) May 13, 2015, p. 1; Assem. Floor Analysis, 3d reading analysis of Assem. Bill No. 809 (2015-2016 Reg. Sess.), as amended Mar. 26, 2015, p. 1; Sen. Com. on Elections & Constitutional Amendments, analysis of Assem. Bill No. 809 (2015-2016 Reg. Sess.) July 7, 2015, p. 1; Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 809 (2015-2016 Reg. Sess.) Aug. 18, 2015, p. 2.)[6] It would frustrate, not further, that purpose for the tax rate for bond measures to be expressed in one format on the ballot label and a different format in the related, statutorily required information materials. (See *AIDS Healthcare Foundation v. Bonta* (2024) 101 Cal.App.5th 73, 95 [courts are "loath to construe [a] statute in a way that would largely frustrate our Legislature's purpose"]; *Hamilton & High*

_____

[6] Though the statements of a bill's author are generally not cognizable legislative history (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062), the committee and floor analyses here adopted the author's statement of the bill's purpose. Committee analyses are cognizable legislative history. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 32-34.)

*LLC v. City of Palo Alto* (2023) 89 Cal.App.5th 528, 571 [courts "'will not interpret a statute in a way that frustrates its fundamental purpose'"]; *Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1062 ["courts 'should avoid interpreting a statute in a manner which would both frustrate its purpose and lead to absurd results'"].)

Moreover, when the Legislature amended section 13119, subdivision (a), in 2017 to add language making clear the statute applied to "a measure authorizing the issuance of bonds" (Stats. 2017, ch. 105 (Assem. Bill No. 195), § 1, eff. Jan. 1, 2018), the Legislature knew section 9401 already required ballot materials to express bond tax rates in a particular way. (See *In re Greg F.* (2012) 55 Cal.4th 393, 407 ["The Legislature is presumed to be aware of all laws in existence when it passes or amends a statute."]; *Reidy v. City and County of San Francisco* (2004) 123 Cal.App.4th 580, 592 [courts "presume the Legislature is aware of existing law when it amends a statute"].) In fact, the legislative history for the 2017 amendment reflects that the Legislature recognized the tax rate information the amendment would require for the ballot label for bond measures was among the "important election information" already included "in the sample ballot or ballot pamphlet." (See Assem. Com. on Elections & Redistricting, analysis of Assem. Bill No. 195 (2017-2018 Reg. Sess.) Mar. 22, 2017, p. 2 [suggesting that adding tax rate information to ballots may be unnecessary because "important election information" is already included "in the sample ballot or ballot pamphlet that is sent to registered voters"]; Sen. Com. on Elections & Constitutional Amendments, analysis of Assem. Bill No. 195 (2017-2018 Reg. Sess.) June 6, 2017, p. 2 [same]; Sen. Rules Com., Off. of Sen. Floor Analyses, Sen. floor analysis of

17

Assem. Bill No. 195 (2017-2018 Reg. Sess.) June 27, 2017, p. 3 [same].) The Legislature passed the amendment anyway.

The subsequent legislative history of section 9401, subdivision (c), confirms the Legislature intended the bond measure tax rate on ballot labels under section 13119, subdivision (b), to be expressed in the same terms as the rates stated in the related information materials. Though subsequent legislative history "cannot change the meaning" of section 13119, subdivision (b), it can "supply an indication of the intent behind the original legislation that may be considered." (*California Highway Patrol v. Superior Court* (2006) 135 Cal.App.4th 488, 504, fn. 10; see *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473 ["a declaration of a later Legislature as to what an earlier Legislature intended is entitled to consideration"]; *People v. Tourville* (2026) 120 Cal.App.5th 439, 458 [same].) Effective January 1, 2024 the Legislature amended section 9401, subdivision (c), to change the "tax rate" for bond measure disclosures to the "tax rate per one hundred thousand dollars ($100,000)."[7]

The Legislature intended the amended section 9401, subdivision (c), to apply not only to the information materials governed by section 9401, but also the tax rate expressed on the ballot. Various committee analyses of the 2024 amendment discussed interchangeably how to express the tax rate in the

---

[7] The tax rate for bond measures had been measured in terms of the cost per $100 in assessed property value since the Legislature first required a tax rate statement disclosure for bond measures. (Stats. 1968, ch. 813, § 1, p. 1570 [enacting what was then section 5301, subdivision (c)]; Stats. 1994, ch. 920, § 2, pp. 4962-4963 [reorganizing the Elections Code].)

sample ballot materials and in the ballot, using the same terminology. (Sen. Com. on Governance & Finance, analysis of Sen. Bill No. 798 (2023-2024 Reg. Sess.) Mar. 29, 2023, pp. 1-2 [describing the tax rate statement, recognizing "the ballot must also include" the "tax rate," and stating "the author wants to change the definition of tax rate to mean the tax rate per $100,000 of assessed value" in "an effort to make these taxes easier to understand"]; Sen. Com. on Elections & Constitutional Amendments, analysis of Sen. Bill No. 798 (2023-2024 Reg. Sess.) Apr. 18, 2023, pp. 2-3 [stating "the ballot must also include" the "tax rate"].) Some of the committee analyses stated that, if the amendment to section 9401, subdivision (c), had been enacted earlier, "the ballot" in an earlier election (not just the ballot materials) "would have expressed the tax rate" in terms of the tax "per $100,000 of assessed value." (Sen. Com. on Governance & Finance, analysis of Sen. Bill No. 798 (2023-2024 Reg. Sess.) Mar. 29, 2023, p. 3; see Sen. Rules Com., Off. of Sen. Floor Analyses, Sen. Floor analysis of Sen. Bill No. 798 (2023-2024 Reg. Sess.) Apr. 21, 2023, p. 3.) The analyses also described the issue the bill would address as whether the Legislature should "require all *ballots* to express tax rates on a per $100,000 basis." (Sen. Com. on Governance & Finance, analysis of Sen. Bill No. 798 (2023-2024 Reg. Sess.) Mar. 29, 2023, p. 3, italics added; see Sen. Rules Com., Off. of Sen. Floor Analyses, Sen. Floor analysis of Sen. Bill No. 798 (2023-2024 Reg. Sess.) Apr. 21, 2023, p. 3.) These analyses suggest the Legislature believed the ballot label tax rate for bond measures was already connected to the rates stated in the voter information materials governed by section 9401.

19

The District cites the introductory clause of section 9401, subdivision (c), which states its definition of "tax rate" for tax rate statements applies "[f]or purposes of this chapter," meaning chapter 5 of division 9 of the Elections Code. The District argues this language shows section 9401 (and its definition of "tax rate" as the tax rate per $100,000 of assessed valuation) applies only to tax rate statements and not to ballots, which are governed by section 13119, which is not in chapter 5 of division 9 of the Elections Code (it's in chapter 2 of division 13). But section 9401, subdivision (c), does not say its definition of tax rate may *only* be used for purposes of chapter 5 of division 9 of the Elections Code, nor does section 13119, subdivision (b), state courts should *not* use the definition of "tax rate" in section 9401, subdivision (c). Given the absence of a "tax rate" definition in section 13119, subdivision (b), it is appropriate to use the definition of that term in another provision in the Elections Code governing ballot material and information. (See *Lee v. Superior Court* (2025) 116 Cal.App.5th 776, 784 ["'We must interpret a statute in context, examining other legislation on the same or similar subjects to ascertain the Legislature's probable intent.'"]; *Wendz v. State Dept. of Education* (2023) 93 Cal.App.5th 607, 633 ["'To understand the intended meaning of a statutory phrase, we may consider use of the same or similar language in other statutes, because similar words or phrases in statutes in pari materia ordinarily will be given the same interpretation.'"][8]; *Mitchell v. United National Ins. Co.* (2005) 127 Cal.App.4th 457, 472

---

[8] Two statutes are "'"'in pari materia when they relate to the same person or thing, to the same class of person[s or] things, or have the same purpose or object."'"' (*Wendz v. State Dept. of Education, supra*, 93 Cal.App.5th at p. 633.)

["Different statutes within the same code should be interpreted to be consistent."]; *Kern County Employees' Retirement Assn. v. Bellino* (2005) 126 Cal.App.4th 781, 788 ["code provisions relating to the same subject must be harmonized to the extent possible"]; see also *Brown v. City of Inglewood* (2025) 18 Cal.5th 33, 44 ["When 'words themselves provide no definitive answer,' we look to other interpretative aids such as legislative history and 'other statutes [that] apply to similar or analogous subjects.'"]; *In re Marriage of Colvin* (1992) 2 Cal.App.4th 1570, 1580 ["statutes should be construed in harmony with other statutes covering the same general subject, even when interpreting provisions in different codes"].)

Interpreting section 13119, subdivision (b), and section 9401, subdivision (c), to allow the District to state the bond tax rate one way on the ballot and another way in ballot information materials would create exactly the kind of voter confusion the Legislature has sought to avoid.  Under the District's proposed interpretation, a municipality could state the tax rate for a bond measure on the ballot per $10, $100, or $1,000 of assessed valuation, and state the tax rate in entirely different terms in the voter information materials governing the same bond measure.  And on the same ballot a voter might see bond measures proposed by different local entities with tax rates stated in different metrics, making it even harder for voters to make informed choices and comparisons and to understand the collective tax consequences of their votes.

Finally, the District argues that, even if "the ballot question was technically defective for not expressing the tax rate on a per $100,000 basis," the ballot question satisfied "the governing substantial compliance doctrine."  Under that doctrine

21

as applied in the elections context, courts may excuse "relatively minor departures" from statutory requirements so long as the departure does not "mislead the public or otherwise frustrate or undermine" the purpose of the statutory requirement or threaten the integrity of the electoral process. (*Costa v. Superior Court* (2006) 37 Cal.4th 986, 1019, 1028.) "The "'doctrine gives effect to [courts'] preference for substance over form.""" (*Environmental Health Advocates, Inc. v. Pancho Villa's Inc.* (2026) 118 Cal.App.5th 778, 870.) But here, the substance of the statutory requirement is the form: how to express the tax rate to voters. The Legislature adopted section 13119, subdivision (b), and section 9401, subdivision (c), to require agencies seeking approval of bond measures to present the tax consequences in a format voters would understand. A deviation in form—presenting the tax rate for a bond measure in terms of the cost per $100 in assessed valuation—frustrates the Legislature's goal of ensuring voters understand the effect issuing the bonds will have on their property taxes.

## DISPOSITION

The judgment denying the petition for writ of mandate is reversed. The trial court is directed to dismiss the petition as moot. (See *Howard Jarvis Taxpayers Assn. v. Bowen* (2011) 192 Cal.App.4th 110, 127-128; *Gebert v. Patterson* (1986) 186 Cal.App.3d 868, 877.) The District's motion to dismiss the appeal is denied. The parties are to bear their costs on appeal.


SEGAL, J.

We concur:

MARTINEZ, P. J.


FEUER, J.